OPINION. Withey, Judge: The only issue involved here concerns the reconstruction of petitioner’s average base period net income. Respondent admits that, as to petitioner’s hardware business which was commenced in 1935, the average base period net income is an inadequate standard of normal earnings because the business was commenced immediately prior to the base period within the meaning of section 722 (b) (4) of the 1939 Code. With respect to petitioner’s wholesale steel warehouse which began operation in May 1940, respondent also concedes that petitioner’s average base period net income is an inadequate standard of normal earnings because there was a change in the capacity for production or operation of its business as a result of a course of action to which petitioner was committed prior to January 1, 1940. Respondent further admits that petitioner’s steel business did not reach by the end of the base period the earning level which it would have reached if it had begun operating its warehouse for wholesaling steel 2 years before the end of the base period. It is conceded by respondent, therefore, that because of the commencement of the hardware business immediately prior to the base period and the change in the capacity for production or operation of the business as a result of a course of action to which petitioner was committed prior to January 1, 1940, petitioner’s excess profits tax computed without the benefit of section 722 results in an excessive and discriminatory tax, entitling petitioner to relief under section 722 (b) (4). Respondent has allowed a constructive average base period net income for 1940 of $32,630, for 1941 of $45,675, for 1942 of $48,937, and for the taxable period January 1, 1943, to July 21, 1943, of $48,937. Petitioner contends that instead of these amounts it is entitled to a constructive average base period net income for 1940 of $36,300, for 1941 of $110,028, for 1942 of $128,460, and for the taxable period January 1,1943, to July 21,1943, of $128,460. The parties are in agreement as to the method to be employed in arriving at a constructive average base period net income to be used in lieu of petitioner’s admittedly inadequate actual average base period net income and they are also in agreement as to all but three of the factors to be used in applying that method. The three factors in issue are: (1) The constructive annual sales level of steel which petitioner would have attained by the end of the base period if its steel warehouse had begun operations on January 1, 1938; (2) the average net profit margin which petitioner would have received on such sales during the base period; and (3) the appropriate index to be used for back-casting petitioner’s 1939 hardware sales to the prior base period years. Eespondent contends that if petitioner had commenced operation of its steel warehouse on January 1,1938, its sales level for steel products would have reached $250,000 by the end of 1939. Petitioner maintains that if its warehouse had been placed in operation on January 1,1938, its 1939 sales of steel would have reached $600,000. In support of its position, petitioner relies on the testimony of William L. Eawn, C. P. Desmond, and William H. Budd. Eawn, petitioner’s president, based his estimate of $600,000 for 1939 sales on a study of the market he had made during the base period. Desmond, formerly assistant treasurer of Bethlehem Steel in charge of treasury functions for the southern California district, had visited petitioner’s steel warehouse frequently and was familiar with its size, arrangement, equipment, accessibility to customers, and sales organization. Inasmuch as he was thoroughly f amilar with steel warehouse operations in Los Angeles during the base period, since practically all such warehouses were customers of Bethlehem Steel, and in view of the fact that he had been associated with Bethlehem for 43 years, Desmond was particularly well qualified to give an opinion concerning petitioner’s reconstructed base period steel sales. Desmond estimated that petitioner could have expected to achieve an annual sales level of $600,000 to $750,000 per year by the end of 1939 if it had begun operation of its steel warehouse on January 1, 1938. This estimate was based upon his opinion that under base period conditions petitioner would have handled 30 to 40 carloads of steel per month, at an average cost of $1,200 to $1,500 per car (based on 20-ton cars and $60 to $70 per ton average mill price) and at an average gross profit of 35 per cent. Using Desmond’s minimum figures, 30 cars at $1,200 per car, and adding 35 per cent of sales price as gross profit, petitioner’s 1939 sales figures would have approximated $55,385 per month or $664,620 annually. Budd, petitioner’s sales manager who previously was a steel salesman with another Los Angeles concern, stated that, in his opinion, petitioner would have achieved an annual sales level of $700,000 to $720,000 for steel products by the end of 1939 if the warehouse had been completed and its operation commenced on January 1, 1938. Budd testified that his estimate was based primarily on his experience with another Los Angeles steel company, the only new company to enter the steel warehouse business in that area during the base period. The average annual turnover of inventory by iron and steel wholesalers in Los Angeles in 1939 was slightly over five times. In 1939, petitioner committed itself to erect a warehouse having a capacity for warehousing 3,000 to 3,500 tons of steel, anticipating an inventory turnover of four or five times per year. At the prevailing selling price of $100 per ton, a turnover of 2,000 tons only three times a year would amount to $600,000. In view of the foregoing evidence, we do not believe that respondent was justified in using an inventory as low as 1,000 to 1,500 tons, an annual turnover of only 2y2 or 3 times, and a sales price of only $46 per ton upon which to base his reconstruction of 1939 sales. We are satisfied that the record justifies our finding that if petitioner’s steel warehouse had been placed in operation on January 1, 1938, its 1939 sales of steel would have reached $600,000. With respect to the average net profit margin which petitioner would have received on steel sales by the end of 1939, the record shows that the price structure for steel in Los Angeles during the base period was very stable and petitioner’s policy was to keep its prices in line with those of its competitors. Competing warehouses fixed their prices so as to provide a gross profit margin of not less than 28 to 30 per cent. Petitioner was served by the same suppliers as the other warehouses and could therefore purchase steel at the same price. Further, it was located in a “free” rail-switching area where, during the base period years, it would incur no incoming freight costs. Under the above circumstances we think petitioner would have derived an average gross profit of at least 28 per cent. Throughout the period 1935 to 1939, petitioner maintained its ratio of operating expense to hardware sales at an average of 11.34 per cent. Petitioner’s president, Pawn, testified that he anticipated that the expense of the steel warehouse would not vary from the hardware warehouse expense by more than 2 to 214 per cent. While the evidence indicates that the ratio of petitioner’s operating expenses on steel sales would have exceeded substantially its ratio of operating expenses on hardware sales, we are of the opinion that the record as a whole warrants the conclusion that its average net profit on such sales would have reached 12 per cent during. 1939. Although we do not approve respondent’s method of computing petitioner’s base period net profit margin, if the figures utilized therein had correctly reflected petitioner’s renegotiation refund in 1942 and 1943 and the increased freight costs incurred in those years due to the curtailment of ocean shipping, which years have significance here only because of the variable credit rule, the respondent’s method of computation would have yielded a base period, net profit on steel of approximately 12 per cent, as compared with the 6.37 per cent margin allowed by him. The appropriate index figures to be utilized in back-casting petitioner’s hardware sales over the base period years would seem clearly to be the wholesale hardware sales index figures, as they more nearly approximate petitioner’s experience during the base period than the indexes for the lumber and construction materials business used by respondent. By utilizing a $600,000 level for steel sales for 1939, a net profit margin of 12 per cent on such sales, and the wholesale hardware indexes for reconstructing petitioner’s base period hardware sales, under the method of reconstruction agreed upon by the parties, we have determined petitioner’s constructive average base period net income to be $36,296 for 1940, $95,278 for 1941, $110,024 for 1942, and $110,024 for the taxable period January 1,1943, to July 21,1943. Reviewed by the Special Division. Decision will ~be entered under Rude 50.